Filed 6/27/24  P. v. Melendez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079925 |
| v. | (Super.Ct.No. FVI20002030) |
| RAMON MELENDEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John P. Vander Feer, Judge.  Affirmed.

Spolin Law, Aaron Spolin, Caitlin Dukes, Jeremy M. Cutcher and Erica B. Esquivel, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randall Einhorn and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant and appellant Ramon Melendez of committing multiple sex acts against his girlfriend's 16-year-old daughter (the victim), and the trial court sentenced him to an aggregate state prison sentence of 78 years.  On appeal, defendant argues his trial attorney rendered constitutionally deficient representation by not objecting to the prosecution admitting expert testimony about child sexual abuse accommodation syndrome (CSAAS).  Because we conclude the expert testimony in this case was properly admitted, and that any objection to its admission would have been futile, defendant cannot establish ineffective assistance of counsel.  We must affirm.

I.

FACTS AND PROCEDURAL BACKGROUND

The People charged defendant with one count of making a criminal threat (Pen. Code,[1] § 422, subd. (a), count 1), four counts of forced oral copulation of a minor over 14 years of age (§ 287, subd. (c)(2)(C), counts 2, 6, 9 & 10), five counts of forcible rape of a child over the age of 14 years (§ 261, subd. (a)(2), counts 3-5, 7 & 8), and alleged various aggravating sentencing factors.

In a motion in limine, the People moved to admit expert testimony about CSAAS because the named child victim did not immediately report her sexual abuse. The People argued the proposed testimony was highly relevant and admissible to educate the jury how child sexual abuse victims often delay disclosing their abuse, for the limited purpose

---

[1]  All undesignated statutory references are to the Penal Code.

2

of assisting the jury in evaluating the victims' testimony but not for the purpose of "prov[ing] that the charged molestations in this case occurred."

During the hearing on pretrial motions, the trial court asked the People for an offer of proof about the expert's testimony. The prosecutor stated the testimony "[w]ould just be the general testimony" about CSAAS. At the close of the hearing, the trial court noted there was no objection to the proposed expert testimony, to which defense counsel replied, "There isn't." Therefore, the trial court granted the People's motion to introduce the testimony.

The victim testified she lived with her mother, her three younger brothers, and defendant (her mother's boyfriend) in a two-bedroom trailer. By the time the family moved into the trailer in February 2019, the victim had known the defendant for a year or two and she saw him as a father figure and disciplinarian. Defendant used violence and threats to discipline the victim and her brothers. From March 2019 to sometime later that year,[2] defendant forced her to have vaginal intercourse five times and on four occasions he placed his mouth on her vagina as she slept.[3] The defendant acted aggressively

---

[2] The victim was 16 years old at the time. Defendant was 35.

[3] Defendant does not challenge the sufficiency of the evidence to support his convictions, and the facts of the sexual abuse as testified to by the victim are not in material dispute.
     As explained, *post*, we conclude the expert testimony about CSAAS was properly admitted and any objection to it would have been futile. Because we find no deficient representation, we need not consider whether defendant suffered any prejudice, which invariably would have required us to consider the strength of the People's evidence. (*Strickland v. Washington* (1984) 466 U.S. 668, 695-696; *In re Gay* (2020) 8 Cal.5th 1059, 1087.) Therefore, we need not recite in detail the facts of the sexual abuse. (See

*[footnote continued on next page]*

toward the victim after the assaults and threatened her and her family with violence. He possessed weapons in the home and on one occasion pointed one at the victim when she refused to lay down with him.

The victim testified she did not tell her mother about the abuse until July 2020 because she thought her mother would not have believed her and "she was going to just tell me not to say anything." The victim also thought her mother would punish her and say, "I just needed to suck it up." Even before the victim reported the abuse, her mother had taken away her cellular telephone so she could not speak with her grandparents, and the mother told the victim to tell her father, "[E]verything in the house was perfect."

By July 2020, the victim felt comfortable telling her mother about the abuse because the defendant was no longer living in the home. When informed about the abuse, the mother told the victim to speak with the defendant. Defendant admitted he had sex with the victim but said she had "want[ed] it." He also told the victim and her mother that he still wanted to be in their lives and that he wanted to give the victim a hug. The victim said she could not stand to be in the same room as the defendant and ran off. A few days later, the victim told her grandparents and the defendant's cousin about the abuse. The same day, the cousin called the police and defendant was arrested. Soon thereafter, the mother disowned the victim for reporting the abuse and has prevented her from speaking with her brothers. The victim now lives with her grandparents.

---

*People v. Chadd* (1981) 28 Cal.3d 739, 743-744 ["Because of the limited nature of the issue [on appeal], we need not recite the facts of the case in detail."].)

4

After the victim testified, the trial court asked the prosecutor to confirm that the next witnesses for the People would be an investigating detective and the CSAAS expert. The prosecutor confirmed that Dr. Jody Ward would testify about CSAAS and rape trauma syndrome. As before, defense counsel interposed no objection to the proposed testimony.[4]

Dr. Ward, a clinical and forensic psychologist, testified she had only been given a general description of the case and had not reviewed the police reports or interviewed any witnesses in the case in preparation for her testimony because her role was simply to discuss CSAAS, rape trauma syndrome, and "victims in general." She would express no opinion whether the victim in this case was telling the truth or whether the defendant committed the crimes he was charged with.

Dr. Ward explained CSAAS "is a pattern of behaviors that many children exhibit who have been sexually abused in an ongoing relationship." Although not all abused children exhibit all the behaviors associated with CSAAS, Dr. Ward testified "it helps us as therapists and lay people, adults in general, really, to understand why children do what they do in response to sexual abuse" because some of those responses are "counter intuitive or not what we would expect." CSAAS is what Dr. Ward described as "a non-diagnostic syndrome, meaning it is not a diagnosis, it is not a mental disorder." In addition, Dr. Ward testified CSAAS is not a diagnostic tool because "it cannot be used to

---

[4] Defense counsel raised no objection to the rape trauma syndrome testimony either, but defendant does not claim that omission constituted ineffective assistance of counsel.

5

determine or diagnose whether or not sexual abuse occurred." Because some of the behaviors associated with CSAAS might be caused by other factors such as a dysfunctional family, it would be improper to use CSAAS "to look back and try to make" a determination whether the child was, in fact, abused. Nonetheless, if it is known the child was abused, CSAAS "is helpful in understanding the child's reaction to that abuse."

Dr. Ward testified children who are abused within an ongoing relationship, "usually by someone they know well and trust, respond very differently than do children who have been abused by strangers." Children who are abused by strangers tend to immediately report the abuse and, when they do so, "they tend to be believed because it fits this idea that we teach our children [that] strangers are the ones that are gonna perpetrate the sexual abuse." Moreover, children who report abuse by strangers "tend to receive more support and tend to recover better" from their abuse. In contrast, children who are abused within an ongoing relationship tend not to immediately report their abuse "because they're not told that 90 percent of the time, the person who's perpetrating the sexual abuse is going to be well known to the child, and loved and respected by the child." When those children do eventually report their abuse, "many times they're not believed" because the abuse does not fit the paradigm of abuse by a stranger. "And because they're not believed, they don't tend to receive the support and help they need to recover from it" and they may suffer "a lot more psychological problems as a result of that ongoing abuse."

CSAAS has five components: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed unconvincing disclosure, and (5) retraction or recantation.

According to Dr. Ward, secrecy refers to the fact the abuse occurs in secret with only the victim and perpetrator present, but also to the fact children tend to keep their abuse secret for long periods of time. Children do not need to be threatened to prevent disclosure, and statements from the perpetrator such as, "Please don't tell. I'll get in trouble," or "Please don't tell, our family will break up," will often suffice. Moreover, children do not need to be reminded to keep the abuse secret "because it's coming from an authority figure and[,] because of the shameful nature of sexual abuse," children naturally keep sexual abuse a secret for a long time.

Dr. Ward explained that helplessness refers to the power imbalance between children and adults. Parents teach children to behave and obey parental figures, and they are often required to give their affection to other adults even if they do not feel comfortable doing so. Helplessness also refers to the fact that children are completely reliant on adults for their material (food and shelter) and emotional needs. "And once a child has become involved in a sexually abusive situation, a child can't get out of that situation like we would be able to as adults." Children cannot leave and go elsewhere to live and support themselves, so they must learn ways to accommodate the abuse.

Entrapment and accommodation refer to the fact that because the child does not report the abuse immediately, the perpetrator knows they can continue to abuse the child. It is related to helplessness because the inability of the child to extricate themself from

7

the abusive relationship or to fight back causes them to fall prey more easily to the abuse and they will find ways to accommodate the abuse. The child victim may acquiesce or go along with the abuse and endure its negative aspects to continue receiving positive aspects of the relationship, such as the material and emotional support they receive from the family. "Many times abusers will make the child feel special as a way to keep them involved in a sexually abusive situation or give them gifts. So all of these things entrap a child into that relationship." Another form of accommodation or coping is for the child to disassociate by mentally placing themself elsewhere or to think of other things while the abuse is taking place.

With respect to delayed unconvincing disclosure, Dr. Ward testified two-thirds of sexually abused children wait until adulthood to report their abuse. When the victim does finally report the abuse, the report can be tentative or hesitant because the victim will often "test the waters" to gauge the response they receive before disclosing every detail of the abuse. If the person to whom the report is made appears to be receptive and supportive, the victim will share more and more details over time as they become more comfortable. Conversely, if the person to whom the victim is tentatively reporting the abuse "either doesn't pick up on the clues or doesn't want to hear a report of sexual abuse, it inadvertently shuts the child down, then that child or even adult is much less likely to make a report of sexual abuse in the future."

Last, Dr. Ward explained that recantation or retraction, though observed less often than the other components, "occur[s] in a substantial minority of cases." Once a child

8

has disclosed sexual abuse, their life is turned completely upside down. The child will endure intrusive interviews with the police, mental health professionals and social workers, and often be given an intrusive physical examination. If the abuse was perpetrated within the child's family, the family is torn apart and, in severe situations, the child might be removed from the family and placed in protective custody or foster care. And, the perpetrator, with whom the child has a relationship, is now facing serious consequences because of the report. "So once all these consequences start hitting, some children will back pedal their allegations. They might say 'It wasn't so bad' or 'I don't remember' or 'I don't recall' as a way of kind of softening all of these consequences." In rare cases, the child might completely recant their allegation of sexual abuse.

Dr. Ward testified not all five components need be present for CSAAS to apply in a particular case, but secrecy and helplessness will be present in every case. When asked hypothetically whether it would be common for a sexual abuse victim to initially disclose some details then disclose more when testifying, Dr. Ward said it "could certainly occur because, like I mentioned before, children tend to disclose more and more details over time as they become comfortable with the disclosure process."

On cross-examination, Dr. Ward testified she had previously interviewed hundreds of sexual abuse victims and perpetrators. The interviews with victims typically lasted one and a half to two hours, and one of the things she would assess was the victim's credibility. Dr. Ward testified she had never met the victim in this case and had no opportunity to assess her credibility. The prosecutor gave Dr. Ward very limited

information about the case in preparation for her testimony, and she had no personal knowledge about the crimes alleged. Finally, Dr. Ward testified she had never met the defendant.

Inter alia, the jury was instructed with CALCRIM No. 303 on limited purpose evidence and with CALCRIM No. 332 on how to evaluate expert testimony. In addition, the trial court instructed the jury with CALCRIM No. 1193 that Dr. Ward's testimony about CSAAS was "not evidence that the defendant committed any of the crimes charged against him," and that the jury could only consider the testimony in deciding whether the victim's "conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [her] testimony."[5]

During closing arguments, the prosecutor briefly addressed Dr. Ward's testimony and reminded the jury the testimony was "not evidence that the defendant committed the crime, but it does go, and does lend itself for you to determine whether or not [the victim's] conduct was consistent with or inconsistent with someone who had been molested." The prosecutor argued the CSAAS testimony helped explain why the victim waited until the defendant moved out of the house to report the abuse and why she hesitated and partially retracted some of her allegations.

---

[5] The instruction read in full:

"You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. Dr. Jody Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [her] testimony."

10

Defense counsel argued the victim was not a credible witness.  Although counsel acknowledged much of Dr. Ward's testimony "makes sense," counsel argued the testimony did not rehabilitate the victim's credibility because Dr. Ward had never met or interviewed the victim.  "She had a one-minute rundown in the hallway regarding the basics of the case with the" prosecutor.

A jury found defendant guilty on counts 1 through 8, not guilty on counts 9 and 10, and, in a bifurcated proceeding, rendered true findings on all aggravating factors for counts 1 through 8.  The trial court sentenced defendant to state prison for an aggregate term of 78 years.

Defendant timely appealed.

## II.

## DISCUSSION

Defendant argues:  (1) the People did not adequately show CSAAS was "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," as provided in Evidence Code section 801, subdivision (a); (2) the People did not carry their burden to produce evidence "as to the existence of the preliminary fact" that jurors harbored misconceptions about child victims of sexual abuse, so as to justify admission of the evidence as provided in Evidence Code section 403, subdivision (a); and, therefore, (3) his trial attorney rendered ineffective assistance of counsel by not objecting to admission of the evidence.[6]  We are unpersuaded.

---

[6] Defendant does not argue CSAAS evidence is never admissible, and he does not contend Dr. Ward's testimony exceeded the limits imposed on the use of such evidence.

11

A.    *Applicable Law.*

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)  To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance "'""fell below an objective standard of reasonableness . . . under prevailing professional norms.'"""  (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)  To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  (*Ibid*.; *In re Harris* (1993) 5 Cal.4th 813, 833.)" (*People v. Mikel* (2016) 2 Cal.5th 181, 198.)

"'[T]he standard for judging counsel's representation is a most deferential one.' (*Harrington v. Richter* (2011) 562 U.S. 86, 105.)  We 'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' (*Bell v. Cone* (2002) 535 U.S. 685, 702.)" (*In re Long* (2020) 10 Cal.5th 764, 773.)

Counsel's failure to object rarely demonstrates ineffective representation.  (*People v. Caro* (2019) 7 Cal.5th 463, 514; *People v. Huggins* (2006) 38 Cal.4th 175, 206.)  "An attorney may well have a reasonable tactical reason for declining to object, and '"[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner

12

challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.”’” (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1312-1313, quoting *People v. Abilez* (2007) 41 Cal.4th 472, 493.)

“While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude. ‘A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.’ (Evid. Code, § 720, subd. (a).) An expert may express an opinion on ‘a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.’ (Evid. Code, § 801, subd. (a).)” (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)

When admissibility of expert testimony depends on the existence of preliminary facts (Evid. Code, § 403, subd. (a)), the trial court may exclude the testimony “only if the ‘showing of preliminary facts is too weak to support a favorable determination by the jury.’” (*People v. Lucas* (1995) 12 Cal.4th 415, 466.) The decision to admit expert testimony is reviewed for abuse of discretion (*People v. Peterson* (2020) 10 Cal.5th 409, 457), meaning it will not be reversed on appeal unless the defendant affirmatively demonstrates the ruling fell outside the bounds of reason (*People v. Johnson* (2022) 12 Cal.5th 544, 605).

B. *Defendant Cannot Establish Ineffective Assistance of Counsel Because CSAAS Evidence Was Properly Admitted in This Case, And Any Objection to Its Admission Would Have Been Futile.*

"'Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held "myths" or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. [Citations.]' (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171.) CSAAS evidence 'is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested.' (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.) 'For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust.' (*Ibid.*) CSAAS evidence 'is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior."' (*People v.*

*McAlpin* (1991) 53 Cal.3d 1289, 1300-1301.)"  (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 214-215.)

Defendant contends that before the trial court could admit CSAAS evidence in this case, Evidence Code section 403, subdivision (a), required the People to demonstrate the preliminary fact that the jurors in this case harbored myths and/or misconceptions about how children respond to sexual abuse.  And, because the People failed to show any jurors in this case harbored such misconceptions and/or myths, the CSAAS testimony was not helpful to the jury as mandated by Evidence Code section 801 and merely bolstered the People's unfair attempt to vouch for the victim's credibility.

Defendant is mistaken.  The admissibility of CSAAS testimony does not depend on whether some or all *the jurors* in a particular case harbor myths and/or misconceptions about how child sexual abuse victims react.[7]  Instead, admissibility rests on evidence of how the child victim responded to their abuse.  "[A]t a minimum the evidence must be targeted to a specific 'myth' or 'misconception' *suggested by the evidence*.  [Citation.]

---

[7] To the extent defendant's argument can be construed to suggest CSAAS testimony is no longer relevant in any case because jurors no longer harbor the misconceptions CSAAS is meant to disabuse (but see *ante*, fn. 6), we are unpersuaded. As stated in *People v. Munch* (2020) 52 Cal.App.5th 464, we are bound by the Supreme Court's holding in *People v. McAlpin, supra*, 53 Cal.3d 1289 that CSAAS evidence is admissible to rehabilitate a child sexual abuse victim's credibility and "'"'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'"'" (*Munch*, at p. 468, quoting *McAlpin*, at p. 1301; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  *Munch* reaffirmed that "CSAAS evidence is a valid and necessary component of the prosecution case in matters involving child abuse," and "the reasoning of *McAlpin* is as valid today as it was in 1991." (*Munch*, at p. 466.)  We have found no published decision that disagrees with *Munch* on that point.

For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings. In the typical criminal case, however, it is the People's burden to identify the myth or misconception the evidence is designed to rebut. Where there is no danger of jury confusion, there is simply no need for the expert testimony. [Citation.]" (*People v. Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394, italics added.)

In their motion in limine, the People argued CSAAS evidence was admissible because the child victim did not immediately report her abuse. The People argued it is widely recognized by persons "involved in the field" that child victims of sexual abuse "rarely disclose molestations by a family member contemporaneously with the abuse and instead often submit to long term molestations." However, "[m]any laypeople incorrectly believe that a child would immediately report inappropriate touching to an adult, teacher, or other trusted person and that if a child failed to do so, he or she must not have been molested," and many are "baffled" with the idea that a child victim would continue to participate in family activities with their abuser. Finally, the People argued the evidence would be introduced solely for the purpose of educating the jury, to "rebut the inference

16

that delayed reporting to authority figures is inconsistent with molestation," and not to prove the defendant's guilt.

The People made a sufficient preliminary showing that evidence of how the victim reacted to her abuse might cause a juror to judge the victim's credibility based on myths and/or misconceptions about how child victims should or should not act. That showing supports the trial court's implicit ruling on the existence of the preliminary facts needed to establish the relevancy of Dr. Ward's testimony. (See Evid. Code, § 402, subd. (c) ["A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto"].) Moreover, the victim's testimony that she did not immediately report her abuse because she feared her mother would not believe her and would punish her; that the defendant was aggressive and threatened her and her brothers with violence during the time he abused her; and that she only felt comfortable reporting the abuse until roughly seven months after the last act of molestation because the defendant no longer lived in the home, amply supported admission of CSAAS evidence to explain the victim's delayed disclosure. "Given the evidence regarding [the victim's] reactions to her sexual abuse was, in fact, consistent with the proffered CSAAS evidence," we conclude "the CSAAS evidence was 'sufficiently probative to be admissible.'" (Cf. *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64-65 . . . [admission of CSAAS testimony was found to be in error where there was no evidence that the 'victims delayed reporting or recanted, and [defendant] did not question their credibility at trial'].)" (*People v. Lapenias*, *supra*, (2021) 67 Cal.App.5th at p. 172.)

17

Because we conclude CSAAS testimony was admissible in this case, we simply cannot conclude defendant's attorney rendered deficient performance by not interposing a futile objection to it. "The failure to object to admissible evidence does not constitute ineffective assistance of counsel when to do so would have been futile." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 934; see *People v. Hines* (1997) 15 Cal.4th 997, 1047 [Objection to admissible evidence "would have been unavailing," and failure to interpose one was not ineffective assistance of counsel]; *People v. Cudjo* (1993) 6 Cal.4th 585, 616 ["Because there was no sound legal basis for objection [to admissible evidence], counsel's failure to object to the admission of the evidence cannot establish ineffective assistance."]; *People v. Burton* (2015) 243 Cal.App.4th 129, 136 [failure to object to admissible impeachment evidence "did not constitute inadequate representation: An attorney has no duty to make motions or objections that would be futile."].) Therefore, we need not determine whether defendant suffered any prejudice.

III.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                    Acting P. J.

We concur:
CODRINGTON
                                    J.
RAPHAEL
                                    J.

18